**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ZTE CORPORATION, a corporation organized under the laws of the Peoples Republic of China, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) C.A. No. |
| VRINGO, INC., a Delaware corporation and VRINGO INFRASTRUCTURE, INC., a Delaware corporation, | ) ) **DEMAND FOR JURY TRIAL** ) ) |
| Defendants. | ) ) |

**ZTE CORPORATION'S OPENING BRIEF IN SUPPORT OF
MOTION FOR EXPEDITED CONSIDERATION
OF A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

Steven A. Moore (CA SBN 232114)
steven.moore@pillsburylaw.com
Callie Bjurstrom (CA SBN 137816)
callie.bjurstrom@pillsburylaw.com
Nicole S. Cunningham (CA SBN 234390)
nicole.cunningham@pillsburylaw.com
Nathaniel R. Smith (CA SBN 257615)
nathaniel.smith@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN
LLP
501 W. Broadway, Suite 1100
San Diego, CA  92101-3575
Telephone: (619) 234-5000
Facsimile:  (619) 236-1995

Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
(302) 888.6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

*ATTORNEYS FOR PLAINTIFF
ZTE CORPORATION*

Dated:  February 5, 2015

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND SUMMARY OF ARGUMENT .................................................1

II.    FACTUAL BACKGROUND .......................................................................................3

    A.  Vringo's Contractual FRAND Commitments. ..........................................................3

    B.     Vringo Repeatedly Breached Its FRAND Commitments ........................................5

        1.   Vringo Sought Excessive Licensing Terms That Violate Its
           FRAND Obligations and Failed to Negotiate with ZTE in Good Faith .................5

        2.   Instead of Negotiating With ZTE, Vringo Further Violated Its
           FRAND Commitments By Seeking and Obtaining Injunctions in
           Numerous Countries Around the World to Gain Improper Leverage
           Over ZTE ...........................................................................................................7

    C.     ZTE Is Being Irreparably Harmed and Will Continue to Suffer Irreparable
        Harm Absent This Court's Intervention. ..................................................................9

III.   ANALYSIS ...............................................................................................................11

    A.     ZTE Can Show A Reasonable Probability of Success on the Merits. ...................11

    B.     ZTE Will Suffer Irreparable Harm Absent Preliminary Relief. ...........................14

    C.     The Balance of Hardships Favors ZTE...................................................................17

    D.     The Public Interest Favors The Injunctive Relief Sought by ZTE. .......................18

IV.    CONCLUSION..........................................................................................................20

i

## TABLE OF AUTHORITIES

**Page**

*Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153 (3d Cir. 1999)..................................11

*Apple, Inc. v. Pystar Corp.*, 673 F. Supp. 2d 943 (N.D. Cal. 2009) ..............................15

*Bergen Drug Co. v. Parke, Davis & Co.*, 307 F.2d 725 (3d Cir. 1962) .......................16

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ................................19

*Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824, 828 (9th Cir. 1997).....................16

*Certain Dynamic Random Access Memories, Components Thereof, and Products Containing Same ("DRAM")*, Inv. No. 337-TA-242,
1987 ITC LEXIS 95 (May 21, 1987)....................................................14

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) ......................................................19

*Conceptus, Inc. v. Hologic, Inc.*, No. C 09-02280 WHA,
2012 WL 44064 (N.D. Cal. Jan. 9, 2012)................................................15

*Cordis Corp. v. Medtronic, Inc.*, 835 F.2d 859 (Fed. Cir. 1987)...................................15

*eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058 (N.D. Cal. 2000) ..................................17

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)...................................................18

*Ericsson Inc. v. D-Link Sys., Inc.*, 2014 WL 6804864 (Fed. Cir. Dec. 4, 2014) ..........................12

*Everett Labs., Inc. v. Breckenridge Pharm., Inc.*,
573 F. Supp. 2d 855 (D.N.J. 2008)
dismissed 363 F. App'x 743 (Fed. Cir. 2009) .........................................16

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*,
415 U.S. 423 (1974)...............................................................11

*Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446 (Fed. Cir. 1988) .................................11

*Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004)...................................16

*Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883 (7th Cir. 2000),
*opinion amended in other respects on denial of reh'g*, 209 F.3d 1032 (7th Cir. 2000) ..........14

*Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012)...................................3

*Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023 (W.D. Wash. 2012)..............................12

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
   290 F.3d 578 (3d Cir. 2002)...............................................15

*Nutrasweet Co. v. Vit-Mar Enters., Inc.*, 112 F.3d 689 (3d Cir. 1997) ........................................11

*Oberto Sausage Co. v. JBS S.A.* 2011 WL 939615 (W.D. Wash. Mar. 11, 2011) .......................15

*Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800 (3d Cir. 1998) ...................16

*Realtek Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998 (N.D. Cal. 2013) ....................12

*Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393 (2d Cir. 2004)......................................................17

*Rent-a-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) ...............................................17

*Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788 (N.D. Tex. 2008).....................19

*Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc.*,
   138 F. App'x 431 (3d Cir. 2005) ............................................15

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) ..............................16

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001).........................17

*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009) ........................................16

*Wyeth v. Natural Biologics, Inc.*, 395 F.3d 897 (8th Cir. 2005)....................................................15

Plaintiff ZTE Corporation ("ZTE") respectfully submits this brief in support of its motion for a temporary restraining order ("TRO") and preliminary injunction to prevent Defendants Vringo, Inc. and Vringo Infrastructure, Inc. (collectively, "Vringo"), during the pendency of this proceeding, from (1) taking action to exclude ZTE products in Romania and (2) contacting ZTE's customers, vendors and/or suppliers to inform them of any Order to cease sales of ZTE products.

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

ZTE filed this lawsuit to force Vringo to honor its contractual commitment to license its standard-essential patents on fair, reasonable and non-discriminatory ("FRAND") terms.  In flagrant violation of this contractual commitment, Vringo has been demanding highly excessive, non-FRAND terms from ZTE and, more recently, has refused to even respond to ZTE's multiple requests for a FRAND license proposal.  *See, e.g.,* Declaration of Nicole S. Cunningham in Support of ZTE Corporation's Motion for A Temporary Restraining Order and Preliminary Injunction ("Cunningham Decl."), Ex. N (Jan. 2015 Ltr. ZTE to Vringo).  Instead of negotiating in good faith with ZTE for a FRAND license, Vringo has chosen to pursue a highly aggressive litigation strategy premised on using its purportedly standard-essential patents to obtain injunctive relief to bar ZTE's 3G and 4G/LTE products from numerous countries around the world.  Vringo's refusal to negotiate with ZTE at all regarding a FRAND license – let alone to negotiate in good faith – and Vringo's injunction-centric worldwide litigation strategy constitute clear breaches of its FRAND obligations.

ZTE requests a TRO to preserve the status quo while the parties brief and the Court considers ZTE's motion for a preliminary injunction.  A TRO is necessary because Vringo threatened this week to take immediate steps to enforce an injunction to exclude all of ZTE's 4G/LTE standard-compliant products from Romania.  *See* Cunningham Decl., Ex. A (Feb. 2,

1

2015 Vringo Press Release).  In addition, Vringo has begun to provide notice to vendors of ZTE's products to inform them to cease all sales of such products in Romania.  *Id.*  Vringo's imminent actions to exclude ZTE's products from the Romanian market and to interfere with ZTE's vendor and customer relationships will cause irreparable harm to ZTE, including loss of customers and potential customers, loss of goodwill and product image, loss of market share, and uncertainty among customers and potential customers.  In addition, ZTE may suffer an irreparable loss of profits because the security that Vringo will be required to post in Romania – only 240 thousand Euro – amounts to less than 1% of the lower end of the 30-40 million Euro in losses that ZTE will suffer in Romania as a result of exclusion.

In contrast to the prospect that ZTE faces of being excluded from an entire market, ZTE's request for a TRO poses no risk of harm to Vringo whatsoever.  Vringo is a non-practicing entity that does not compete with ZTE at all, let alone in the Romanian market for the products at issue.  Thus, the balance of hardships tilts overwhelmingly in ZTE's favor here, highlighting the need to prevent irreparable harm and preserve this Court's ability to resolve the merits of ZTE's claims.

Vringo's conduct has made its motives clear: it is seeking to apply the massive leverage of injunctions on standard-essential patents despite ZTE's multiple, unanswered requests for a FRAND license, precisely the patent "hold-up" conduct that the FRAND contract obligation bars.  If left unchecked, Vringo's ability to exclude ZTE products that comply with 4G/LTE standards in Romania will enable Vringo to demand far more than the reasonable value of its patented invention; Vringo will be extracting the value of standardization itself.  This lawsuit was filed to prevent Vringo from hijacking the standard setting process for its individual gain.  The injunction ZTE seeks will do nothing more than preserve this Court's ability to resolve the dispute in a reasonable and timely fashion, and prevent the irreparable harm that ZTE and the public will suffer if Vringo is able to wield its FRAND encumbered patents to exclude ZTE from

the market in Romania and elsewhere.

This is not the first Court that has been asked to decide this issue.  The Ninth Circuit Court of Appeals affirmed the District Court for the Western District of Washington's decision to grant precisely the kind of temporary relief that ZTE requests here.  There, the Court affirmed the issuance of a preliminary injunction temporarily enjoining a patent owner from enforcing a patent injunction that it obtained in a German proceeding, much as ZTE now requests the Court to temporarily prevent Vringo from enforcing a Romanian Court's injunction.  *See Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012).  Such temporary relief is as appropriate here as it was in *Microsoft*.

## II.    FACTUAL BACKGROUND

### A.    Vringo's Contractual FRAND Commitments.

Standardization of technology carries a risk that even one owner of standard-essential patents will "hold up" companies that invest in implementing the standard, extracting royalties far in excess of the value of their patents.  To avoid this danger, Standards Setting Organizations ("SSOs") require participants in the standard-setting process to follow specific licensing policies.  Those licensing policies typically require participants to agree that any standard-essential patents will be made available on fair, reasonable and non-discriminatory ("FRAND") terms to all those who implement the standard.  One such organization is the European Telecommunications Standards Institute ("ETSI"), an independent, non-profit SSO that produces globally-accepted standards for the telecommunications industry.  ETSI created or helped to create numerous telecommunication standards, including the 2G/GSM, 3G/WCDMA/UMTS, and 4G/LTE cellular communication standards.

ETSI has adopted an Intellectual Property Rights ("IPR") Policy, incorporated as Annex 6 of the ETSI Rules of Procedure.  Cunningham Decl., Ex. B (ETSI IPR Policy).  The ETSI IPR

Policy requires members to disclose standard-essential and potentially standard-essential patents and patent applications to ETSI and its other members.  The IPR Policy further requests that standard-essential patent owners submit an irrevocable written undertaking, binding on all successors-in-interest, stating that they are prepared to grant licenses on FRAND terms and conditions.  If a FRAND undertaking is not available, the IPR Policy provides for ETSI to attempt to change the standard to avoid the patent in question.

ETSI has more than 750 members from 64 countries across five continents, including ZTE and Nokia Corporation ("Nokia").  Vringo claims to have acquired a global patent portfolio from Nokia, including patents that Nokia has declared to be standard-essential to ETSI standards. On August 9, 2012, Vringo issued a press release containing the following announcement:

> Vringo, Inc. (NYSE MKT: VRNG), a company engaged in the innovation, development and monetization of mobile technologies and intellectual property, today announced that it had entered into a Patent Purchase Agreement with Nokia Corporation pursuant to which Nokia agreed to sell Vringo Infrastructure a portfolio consisting of over 500 patents and patent applications worldwide, including 109 issued United States patents.
>
> Vringo Infrastructure agreed to compensate Nokia with a cash payment and certain ongoing rights in revenues generated from the portfolio.
>
> Thirty one of the 124 patent families acquired have been declared essential by Nokia to wireless communications standards.

Cunningham Decl., Ex. C ((August 9, 2012 Vringo Press Release).

In the declarations that Nokia made to ETSI, Nokia irrevocably agreed to grant licenses to the patents declared to be standard-essential on FRAND terms.  In doing so, Nokia agreed to these licensing policies and undertook binding contractual commitments to license its essential patents on FRAND terms.  As Nokia's successor-in-interest to these patents, Vringo is contractually obligated to grant licenses to its standard-essential patents to ZTE on FRAND terms.

**B.  Vringo Repeatedly Breached Its FRAND Commitments**

**1.  Vringo Sought Excessive Licensing Terms That Violate Its FRAND Obligations and Failed to Negotiate with ZTE in Good Faith**

On September 25, 2012, Vringo wrote to ZTE informing ZTE that it had acquired a portfolio of unidentified patents and patent applications, a number of which had been declared to be essential for the implementation of certain GSM/GPRS, 3GPP, and UMTS standards and others, although they were not declared to be essential, could be infringed by ZTE equipment. Cunningham Decl., Ex. D (Sept. 25, 2012 Ltr. Vringo to ZTE).  On the basis of these statements, Vringo asked ZTE to make a firm offer specifying the patents that it wanted to have licensed to it, the terms and conditions of such licenses, which were to be FRAND, and the price it was prepared to pay for the past use of the patents.  Nonetheless, on October 5, 2012, without any further notice or letter before taking action, Vringo initiated patent infringement proceedings in the UK High Court against ZTE (UK) Limited.  In that action, Vringo asserted six patents against ZTE (presumably the strongest of the Nokia patents).  Cunningham Decl., Ex. E (Oct. 8, 2012 Vringo Press Release).

ZTE expressed its willingness to take a license for any patents found to be valid and infringed in the UK proceedings, and requested that Vringo make a more detailed licensing proposal as well as the royalties sought in those proceedings.  Through a series of letters, ZTE expressed its interest in licensing valid, infringed, and essential patents on FRAND terms.  This correspondence included the following paraphrased questions from ZTE to Vringo:

> Will the royalty be payable for all patents that have been declared essential, even if one or more of the patents are not used by ZTE?
>
> Does the same royalty rate apply to sales of infrastructure equipment in each country where there is a patent, irrespective of the number and scope of the Standards Essential Patents (SEP) in that country and even if one of the SEPs is not used or revoked?
>
> Is Vringo willing to specify a royalty which would apply on a per-patent basis?

Is the royalty payable on the total value of the equipment, even if the only applicable SEP covers a relatively minor aspect of the infrastructure equipment?

Is Vringo willing to consider an appropriate apportionment of revenue for the purpose of calculating the royalty?

What is the basis for the proposed royalty rate?

Why is this rate and approach considered by Vringo to be FRAND?

Cunningham Decl., Ex. F (Apr. 18, 2013 Ltrs. ZTE to Vringo).

Without warning, Vringo issued an application to join ZTE Corporation in the ongoing UK proceeding, and asked the UK Court to determine the terms of a global license on FRAND terms first, before deciding issues of validity, essentiality, and infringement.  In June 2013, the UK Court denied Vringo's requests.  The Court held that it would be unfair to set a global royalty rate, applicable in all countries, if the patents would later be held invalid.  The Court added that ZTE's refusal to take a license to invalid and/or not infringed patents did not make it an unwilling licensee.

In its licensing negotiations with ZTE, Vringo has staked out a highly aggressive posture for its allegedly standard-essential patents that is inconsistent with its FRAND obligations.  For example, according to documents available on Vringo's website, in May 2013, Vringo provided ZTE with a term sheet setting forth the terms under which it would license its standard essential patents:

6

> d.   Applicable Royalty Rates.
>
> ZTE may elect to take a license to all of the Essential Patents for the GSM Standard, the UMTS Standard and the LTE Standard together at the following rates:
>
> $2.50 for each Smartphone made or sold by ZTE and $1.20 for all other Subscriber Units sold by ZTE.
>
> 1.50% of Infrastructure Revenues.
>
> ZTE may also elect to take separate licences under the GSM Patents, UMTS Patents and LTE Patents at the following rates:
>
> |                        | GSM    | UMTS   | LTE    |
> |------------------------|--------|--------|--------|
> | Smartphone             | $0.85  | $0.85  | $0.85  |
> | Subscriber Unit        | $0.40  | $0.40  | $0.40  |
> | Infrastructure Revenues| 0.5%   | 0.5%   | 0.5%   |
>
> Any license to a single Standard shall be for single-mode products compliant with that Standard only.  Any license to two Standards shall only cover single-mode products compliant with the two Standards and dual-mode products compliant with both Standards

Cunningham Decl., Ex. H (Vringo Essential Patent License Term Sheet) (*publicly available at* http://www.vringoip.com/documents/FG/vringo/ip/35142_CMC_Term_Sheet.pdf); *see also* Cunningham Decl., Ex. I (Nov. 12, 2013 Vringo Press Release).  The royalty demands set forth in this term sheet are excessive and violate Vringo's contractual FRAND obligations.

> **2.   Instead of Negotiating With ZTE, Vringo Further Violated Its FRAND Commitments By Seeking and Obtaining Injunctions in Numerous Countries Around the World to Gain Improper Leverage Over ZTE**

In addition to demanding excessive royalties from ZTE that do not comply with its FRAND obligations, Vringo has aggressively litigated its allegedly standard-essential patents against ZTE around the world, seeking injunctive relief.  On June 23, 2014, Vringo sued ZTE in Romania, alleging infringement of the Romanian part of a patent that had been declared essential to ETSI in connection with 4G LTE standards.  Cunningham Decl., Ex. J (June 26, 2014 Vringo

Press Release).  In that action, Vringo sought not only damages, but a permanent injunction.  In July 2014, Vringo requested and obtained, *ex parte*, an interim injunction prohibiting ZTE and its distributors from importing, exporting, introducing on the market, offering for sale, storing, selling, distributing, promoting and/or conducting any other trading activity with respect to any 4G/LTE mobile phone and any infrastructure equipment produced by ZTE which incorporates 4G/LTE technology.  Cunningham Decl., Ex. K (Oct. 13, 2014 Vringo Press Release).  While ZTE appealed this ruling, on January 8, 2015, the Romanian Court rejected ZTE's appeal of the interim injunction and immediately reinstated the injunction.  Cunningham Decl., Ex. A (Feb. 2, 2015 Vringo Press Release).

Following this ruling, ZTE sent a letter to Vringo reaffirming ZTE's commitment to license any patents which are valid and infringed, and offering guarantees to Vringo in that respect.  Cunningham Decl., Ex. N (Jan. 2015 Ltr. ZTE to Vringo).  ZTE explicitly requested that Vringo provide a license proposal by February 2, 2015.  *Id.*  Vringo did not provide ZTE with any response to its request.  Instead, on that very same date, Vringo issued a Press Release threatening to enforce its injunction against ZTE products in Romania and to contact ZTE's customers.  Cunningham Decl., Ex. A (Feb. 2, 2015 Vringo Press Release).  Vringo has similarly ignored ZTE's requests for FRAND license proposals in other jurisdictions, choosing instead to pursue injunctive relief to bar the importation or sale of ZTE products worldwide.

Similarly, Vringo sued ZTE in Germany, asserting infringement of the German part of two patents which are subject to standard-essential declarations at ETSI.  Cunningham Decl., Ex. L (Oct. 10, 2013 Vringo Press Release).  Vringo obtained a permanent injunction against ZTE in that action, prohibiting ZTE from selling or importing 3G UMTS SDR Base Stations. Cunningham Decl., Ex. A (Feb. 2, 2015 Vringo Press Release).

Vringo filed an action against ZTE in Brazil in April 2014 for patent infringement.  In that action, Vringo again sought and obtained an injunction restraining ZTE from manufacturing, using, offering for sale, selling, installing, testing, or importing 3G/4G/LTE infrastructure equipment.  Vringo took action to enforce the injunction on April 17, 2014, and the injunction remains in place today.  Cunningham Decl., Exs. A (Feb. 2, 2015 Vringo Press Release) and M (June 18, 2014 Vringo Press Release).

In each of the actions against ZTE detailed above asserting infringement of patents that had been declared to ETSI as essential to 3G and/or 4G/LTE, Vringo sought and obtained injunctive relief.  Vringo has also filed actions against ZTE in other countries, such as Australia, India, Malaysia, France, the Netherlands, and the United Kingdom, including actions in which Vringo sought injunctions against ZTE for standard-essential patents.  Vringo has further publicly threatened to use the courts "world-wide" to force ZTE into licenses on its terms – not FRAND terms.  Cunningham Decl., Ex. A (Feb. 2, 2015 Vringo Press Release).  Vringo's repeated requests for injunctive relief in worldwide patent litigation involving allegedly standard-essential patents violates Vringo's FRAND commitments and is causing irreparable harm to ZTE.

## C.  ZTE Is Being Irreparably Harmed and Will Continue to Suffer Irreparable Harm Absent This Court's Intervention.

On February 2, 2015, Vringo issued a press release stating that it has initiated efforts to enforce the injunction it obtained from the Romanian Court on January 8, 2015.  Cunningham Decl., Ex. A (Feb. 2, 2015 Vringo Press Release).  In the press release, Vringo states that it has provided notice to vendors of ZTE handsets and infrastructure equipment informing them that the Court has ordered them to cease all sales of ZTE 4G/LTE products in Romania.  *Id.*  The Romanian Court's Order, however, is not self-executing.  Vringo must take further affirmative

steps to exclude ZTE's standard-compliant products from Romania – namely, it must deposit a security bond amounting to EUR 240,000.  Declaration of Mr. Yi Hu (Oliver) in Support of ZTE Corporation's Motion for A Temporary Restraining Order ("Hu Decl."), ¶¶ 4-5.

This motion seeks temporarily to prevent Vringo from taking those steps, relief to which ZTE is entitled under the preliminary injunction standard.  Under that standard, ZTE is *not* asking this Court to interfere with an order by the Romanian court.  Rather, this motion seeks to prevent Vringo from making an end-run around the authority of this Court – by enforcing its injunction in Romania and contacting ZTE's vendors and customers – to specifically enforce Vringo's FRAND commitments.

ZTE's request poses no risk of harm to Vringo.  ZTE does not compete with Vringo in the Romanian market for the products at issue.  In fact, Vringo does not make or sell any products.  And, in the unlikely event that Vringo prevails here (meaning that it has no obligation to grant ZTE a FRAND license), Vringo could then take action under the Romanian Court's Order.

In contrast to the lack of harm to Vringo if the temporary injunction is entered by this Court, the failure to enter it would seriously and irreparably harm ZTE.  ZTE will suffer losses of approximately 30 million to 40 million Euro based on contractual obligations it cannot meet, should Vringo enforce its injunction and exclude ZTE's 4G/LTE products from Romania.  Hu Decl., ¶ 6.  In addition to these significant monetary losses, ZTE has suffered and will continue to suffer irreparable harm to its customer relationships, including loss of market share and market exposure opportunities, damage to ZTE's reputation, and loss of goodwill based on Vringo's actions and threatened actions.  Hu Decl., ¶ 8.  Thus, failure to enter the TRO sought in this motion will cause irreparable harm to ZTE.

## III.   ANALYSIS

A temporary restraining order and preliminary injunction preserve the status quo so that the Court may adjudicate a potentially meritorious claim for relief while protecting the movant against irreparable harm.  *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974) (purpose of a TRO is "preserving the status quo and preventing irreparable harm").  The standard for the issuance of a temporary restraining order, which is the same as for a preliminary injunction, is well established:

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary injunctive relief will result in even greater harm to the non-moving party; and (4) whether granting the preliminary relief will be in the public interest.

*Allegheny Energy, Inc. v. DQE, Inc*., 171 F.3d 153, 158 (3d Cir. 1999); *Nutrasweet Co. v. Vit-Mar Enters., Inc.*, 112 F.3d 689, 692-93 (3d Cir. 1997) (standard for temporary restraining order is the same as for a preliminary injunction).  When evaluating these factors, the Court should "weigh and measure each factor against the other factors and against the form and magnitude of the relief request[ed]." *Hybritech Inc. v. Abbott Labs*., 849 F.2d 1446, 1451 (Fed. Cir. 1988).

ZTE has satisfied each of the factors required for entry of a temporary restraining order.

### A.   ZTE Can Show A Reasonable Probability of Success on the Merits.

To prevail on this factor, ZTE need only forecast proof that Vringo has breached its contractual FRAND obligations.  This test is satisfied.  There is no question that Vringo is contractually obligated to offer ZTE a license to its standard-essential patents on FRAND terms.  Vringo purports to be the owner of a global patent portfolio that it acquired from Nokia, and which includes patents that Nokia has declared to relevant SSOs, including  ETSI, to be essential to 3G and 4G/LTE cellular communication standards.  In those declarations, Nokia irrevocably agreed, in accordance with the ETSI IPR Policy, to grant licenses to such patents on FRAND

terms and conditions.  Having acquired Nokia's patent portfolio, Vringo assumed Nokia's contractual commitments, including the obligation to offer a license to any standard-essential patents on FRAND terms, consistent with the ETSI IPR Policy.  Therefore, Vringo is contractually bound to negotiate with ZTE in good faith and grant licenses to its essential patents on FRAND terms.  *See, e.g., Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1036-38 (W.D. Wash. 2012) (holding that Motorola entered into binding contract with SSOs to license standard-essential patent on FRAND terms and that Microsoft was a third-party beneficiary of those contracts).

ZTE can also show that Vringo has breached its contractual FRAND commitments by refusing to negotiate with ZTE in good faith and, instead, pursuing highly aggressive litigation tactics that are centered on improper attempts to use allegedly standard-essential patents to obtain injunctive relief.  As detailed in Section II(B) above, ZTE is a willing potential licensee of valid, infringed standard-essential patents on FRAND terms.  *See, e.g.,* Cunningham Decl., Exs. F and N.  But rather than negotiate a FRAND license with ZTE in good faith, Vringo has (1) demanded excessive royalty terms and (2) sought and obtained injunctive relief against ZTE in multiple countries around the world, including in Germany, Brazil and Romania.  *See, e.g.,* Cunningham Decl., Exs. A and H.  Vringo has threatened to continue its aggressive, injunction-focused litigation tactics worldwide.  Cunningham Decl., Ex. A.  Both Vringo's excessive royalty demands and its injunction-focused litigation strategy constitute breaches of its contractual FRAND commitments.  *See, e.g., Ericsson Inc. v. D-Link Sys., Inc*., 2014 WL 6804864 at *2 (Fed. Cir. Dec. 4, 2014) (emphasizing that a patent "hold-up" occurs "when the holder of a standard-essential patent demands excessive royalties after companies are locked into using a standard); *Realtek Semiconductor Corp. v. LSI Corp*., 946 F. Supp. 2d 998 (N.D. Cal. 2013) (granting summary judgment on potential licensee's breach of contract claim where patent

holder did not attempt to offer a license until after seeking injunctive relief and there was no

indication that the potential licensee was not willing to accept a license on FRAND terms).

Moreover, Vringo's recent conduct in connection with the Romanian proceedings clearly

evidences Vringo's refusal to honor its contractual FRAND obligations to negotiate with ZTE in

good faith. There, ZTE explicitly indicated that it was interested in taking a license and asked

Vringo to propose terms. Cunningham Decl., Ex. N. Although the dates set forth in ZTE's

letters for a response have passed, Vringo wholly ignored ZTE's requests and, to date, has

provided no response whatsoever. In fact, on the very same date by which ZTE requested a

response regarding the Romanian patents – February 2, 2015 – Vringo issued a press release

touting that it had initiated efforts to enforce the Romanian Court's injunction against ZTE and

that Vringo had begun contacting ZTE's vendors to inform them that the Court has ordered them

to cease all sales of ZTE 4G/LTE products in Romania. Cunningham Decl., Ex. A. Thus,

Vringo has now refused to negotiate with ZTE at all in response to ZTE's request for a FRAND

license proposal, choosing instead to pursue an a heavy-handed enforcement strategy. Vringo's

actions are the antithesis of good faith. Any one of its actions as discussed above is

independently-sufficient to show a reasonable likelihood of success in proving that Vringo

breached its contractual FRAND commitments, and taken together, Vringo's pattern of conduct

shows a deliberate refusal to negotiate with ZTE in good faith as it is contractually obligated to

do.

Finally, ZTE's FRAND rights—and Vringo's FRAND obligations—are worldwide in

scope. A ruling by this Court that those rights and obligations bar Vringo from obtaining

injunctive relief accordingly will have worldwide effect: *i.e.*, that ZTE is entitled to a worldwide

license under the declared standard-essential patents on FRAND terms, a license that ZTE is

eager to obtain. A ruling that Vringo is contractually bound to grant a FRAND license, coupled

with ZTE's expressed interest to accept a FRAND license, necessarily means that Vringo cannot seek to enjoin ZTE from using its standard-essential patents, even if the ultimate determination of the precise FRAND terms cannot be made until later. *See*, *e.g., Certain Dynamic Random Access Memories, Components Thereof, and Products Containing Same ("DRAM")*, Inv. No. 337-TA-242, 1987 ITC LEXIS 95, at *31 (May 21, 1987) ("[E]ven though a royalty obligation might accrue, an injunction may not issue against the beneficiary of a promise, which, if enforced, would be inconsistent with suit for an injunction"). Because ZTE has a high likelihood of establishing in this suit that it is entitled to a FRAND license, preliminary relief is appropriate: Vringo's injunctive efforts in Romania and elsewhere around the world are inconsistent with what will ultimately be ZTE's *worldwide* license to Vringo's purportedly standard-essential patents.

**B.      ZTE Will Suffer Irreparable Harm Absent Preliminary Relief.**

Absent a preliminary injunction, ZTE will suffer irreparable harm from the impending exclusion of its products from the Romanian market, and from Vringo's improper attempts to contact ZTE's customers and vendors regarding the Romanian Court's Order. First, ZTE will suffer monetary harm of approximately 30-40 million Euro, which far exceeds the bond that the Romanian Court is requiring Vringo to post. Indeed, the 240 thousand Euro bond which Vringo intends to post in order to enforce the Romanian injunction constitutes less than 1% of the lower end of the losses that ZTE is estimated to suffer as a result of the exclusion of its 4G/LTE products from Romania. Vringo's bond is so egregiously insufficient as compared to the losses that ZTE will suffer as a result of the injunction that ZTE's monetary harm will be irreparable. *See Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000) ("When setting the amount of a security, district courts should err on the high side. … Unfortunately, an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary

injunction cannot exceed the amount of the bond."), *opinion amended in other respects on denial of reh'g*, 209 F.3d 1032 (7th Cir. 2000).

Moreover, even if Vringo's exclusion actions were only temporary, ZTE would suffer significant and irreparable competitive and reputational injuries. The quantification of such injuries is inherently speculative, such that they are not compensable by monetary damages and constitute irreparable harm. First, ZTE's loss of market share in Romania is irreparable harm. *See Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc.*, 138 F. App'x 431, 435 (3d Cir. 2005) (affirming order granting motion for preliminary injunction where plaintiff "would suffer irreparable harm in the form of a loss of market share"); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 595-96 (3d Cir. 2002) ("In a competitive industry where consumers are brand-loyal, we believe that loss of market share is a 'potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'") (citation omitted); *see also id.* at 596 ("a loss in market share caused by an injunction could result in irreparable harm") (quoting *Cordis Corp. v. Medtronic, Inc.*, 835 F.2d 859, 864 (Fed. Cir. 1987)); *Wyeth v. Natural Biologics, Inc.*, 395 F.3d 897, 902–03 (8th Cir. 2005) (affirming permanent injunction where defendant would cause "irreparable harm in the form of loss of market share"); *Oberto Sausage Co. v. JBS S.A.* 2011 WL 939615, at *6 (W.D. Wash. Mar. 11, 2011) (finding likelihood of irreparable harm in part where defendant's conduct would cause "loss of market share growth"); *Apple, Inc. v. Pystar Corp.*, 673 F. Supp. 2d 943, 949 (N.D. Cal. 2009) (harm from infringement of Apple's copyrights on the Mac OS X operating system to the product's competitive position and market share was difficult to quantify and constituted irreparable harm); *Conceptus, Inc. v. Hologic, Inc.*, No. C 09-02280 WHA, 2012 WL 44064, at *2 (N.D. Cal. Jan. 9, 2012) (loss of market share and loss of customers and access to potential customers demonstrated irreparable harm).

Vringo's actions in Romania will further cause irreparable harm because an entire line of ZTE's products – specifically, all 4G/LTE products – will be excluded from Romania, further hurting ZTE's competitive and market position there.  *See, e.g., Bergen Drug Co. v. Parke, Davis & Co.*, 307 F.2d 725 (3d Cir. 1962) (reversing and remanding with directions to grant preliminary injunction; irreparable harm found where inability to supply a full line of products would cause purchasers to shift business to other suppliers); *Everett Labs., Inc. v. Breckenridge Pharm., Inc.*, 573 F. Supp. 2d 855, 867 (D.N.J. 2008) (granting preliminary injunction and finding irreparable harm where plaintiff would lose brand recognition of an entire line of products), dismissed, 363 F. App'x 743 (Fed. Cir. 2009); *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (upholding preliminary injunction in part because "the inability to supply a full line of products may irreparably harm a merchant by shifting purchasers to other suppliers"); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19–20 (1st Cir. 1996) (upholding preliminary injunction and finding of irreparable harm based on disruption to one part of plaintiff's broader product offering, because "in a variety of other commercial settings, the availability of a product line is as important, if not more important, than the amount of sales generated"); *see also Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824, 828 (9th Cir. 1997) (ordering entry of an injunction because evidence of "lost sales and [plaintiff's] inability to reposition itself as a service-oriented company" as irreparable harm could not be rebutted simply by observing that such commercial injuries "seem[ed] to be quantifiable").

Similarly, the harm to ZTE's customer relationships, reputation and goodwill will be irreparable.  *See*, *e.g., Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700, 726 (3d Cir. 2004) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.") (quoting *Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d

16

Cir. 1998))*; Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 404 (2d Cir. 2004) (affirming finding

of irreparable harm where it was "impossible to estimate with any precision the amount of the

monetary loss which has resulted and which would result in the future from the loss of

[plaintiff's] relationships with customers and co-brand partners, by reason of [defendant's]

actions") (internal quotation marks omitted)*; Rent-a-Center, Inc. v. Canyon Television &

Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (damage to reputation or goodwill,

because it is difficult to quantify, qualifies as irreparable harm); *eBay, Inc. v. Bidder's Edge, Inc.*,

100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) ("Harm resulting from lost profits and lost

customer goodwill is irreparable because it is neither easily calculable, nor easily compensable

and is therefore an appropriate basis for injunctive relief."); *see also Stuhlbarg Int'l Sales Co. v.

John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (noting that the "threatened loss of

prospective customers or goodwill certainly supports a finding of the possibility of irreparable

harm").

      A TRO and preliminary injunction must be issued to prevent the very real, irreparable

harm that will clearly result prior to this Court's resolution of the key dispositive question—

whether ZTE is entitled to a FRAND license.

**C.**      **The Balance of Hardships Favors ZTE.**

      ZTE asks this Court to grant temporary relief to preserve the status quo just long enough

to decide whether Vringo must provide a license on FRAND terms.  Delaying Vringo's improper

injunctive activity while this Court addresses the FRAND issues carries at most a risk of only

marginal economic harm to Vringo, and certainly no irreparable injury.  There will be no

competitive injury to Vringo if it is temporarily delayed in seeking exclusion of ZTE products

from Romania—Vringo does not compete with ZTE in the markets for the targeted products

(4G/LTE cellular handsets and infrastructure equipment).  In fact, Vringo is a non-practicing

entity and does not make or sell any products whatsoever, let alone products that would compete with the ZTE products that it seeks to exclude from Romania. *Cf. eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 396 (2006) (Kennedy, J., concurring) (noting that, in the hands of a non-competitor, "an injunction, and the potentially serious sanctions arising from its violation, can be employed as a bargaining tool to charge exorbitant fees to companies that seek to buy licenses to practice the patent[, even where] the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations"). Accordingly, any injury to Vringo would be compensable by a royalty for any relevant ZTE activity in Romania while this action is pending. A brief delay in Vringo's enforcement of the Romanian injunction would have no meaningful impact on Vringo.

In contrast, ZTE, like other product makers the world over, has incorporated 4G/LTE technology into its products in reliance upon the promises made to license Vringo's standard-essential patents on FRAND terms. Absent preliminary relief, it is highly likely that Vringo will further pursue its attempts to exclude ZTE's 4G/LTE products from Romania, and to improperly continue to contact ZTE's vendors and customers, before this Court can determine whether Vringo must grant ZTE a FRAND license. In sum, ZTE stands to suffer much greater hardship than Vringo if a TRO and preliminary injunction are wrongfully withheld, and this factor weighs heavily in ZTE's favor.

**D.     The Public Interest Favors The Injunctive Relief Sought by ZTE.**

Permitting Vringo to exclude ZTE's 4G/LTE products from Romania, notwithstanding ZTE's contractual right to a FRAND license, would harm the public interest by undermining the integrity of the SSO process and directly damaging those companies that have invested in 4G/LTE implementations in reliance on the FRAND commitments surrounding that standard. Vringo's exclusion efforts undermine the SSO framework as Vringo shirks its contractual

18

commitments and improperly exploits the market power its predecessor-in-interest, Nokia, obtained only as a result of that framework. *Cf. Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007) (granting injunction in part based on the "general public interest in the enforcement of voluntarily assumed contract obligations").

Standards and SSOs play a critical role in fostering innovation. Standards facilitate the adoption of technology from many different vendors whose products can interoperate with one another. When the SSO framework is running properly, and its participants are playing by the rules, SSOs facilitate interoperability and encourage healthy competition, including price competition by reducing switching costs for consumers. *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308–14 (3d Cir. 2007) (explaining how industry standard-setting can enhance consumer welfare by increasing competition, preventing patent hold-up, and reducing costs).

In accordance with ETSI policies, Nokia agreed to make licenses to its standard-essential patents available on a FRAND basis, and ZTE and other companies relied on the integrity of the SSO process and Nokia's promises in developing and marketing products compliant with that standard. Vringo is now seeking the very patent hold-up that will undo the standard-setting process if not restrained by this Court by threatening to exclude ZTE's products from Romania despite its obligation to grant ZTE a worldwide license on FRAND terms. The sort of "patent hold-up" or "patent ambush" that Vringo is imposing on ZTE is the exact harm that the patent policies of the SSOs were designed to eliminate. *See, e.g., Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 791, 794 (N.D. Tex. 2008); *see also Broadcom*, 501 F.3d at 312 (explaining the "unique dangers of deception in the standard-setting context … where participants rely on structural protections, such as rules requiring the disclosure of [intellectual property rights], to facilitate competition and constrain the exercise of monopoly power"). If the benefits of standardization are to be realized by the public, patentees must grant the promised

licenses and on terms that do not seize for the patentee the economic benefit of standardization itself as opposed to the intrinsic value of its patents.

Allowing Vringo to avoid its contractual obligation undermines the SSO framework and the value that it provides to manufacturers, designers, and ultimately consumers.  Vringo's actions directly affect those, like ZTE, who practice the 4G/LTE standards and undertook to do so only because of the FRAND obligation.  Further, Vringo's actions threaten other companies that rely upon a broad base of standards-compliant products to generate demand for their own 4G/LTE products and content.  More broadly, permitting Vringo to exclude standards-compliant products in the face of its obligation to license not only would directly damage the 4G/LTE standards, but also would inhibit the development of new standards, and the resulting benefit to the public, in the future.

## IV.    CONCLUSION

For the reasons set forth herein, ZTE respectfully requests that this Court grant its Motion for Temporary Restraining Order and Preliminary Injunction and enter an order barring Vringo and any subsidiaries or entities that it controls from (1) taking any action to exclude ZTE products in Romania during the pendency of this FRAND proceeding; and (2) contacting any of ZTE's customers, vendors or suppliers anywhere in the world to inform them of any Order to cease sales of ZTE products during the pendency of this FRAND proceeding.  If ZTE prevails on its claims that Vringo has breached its FRAND obligations, the Court can then take up the issue of how this temporary relief should be transformed to permanent relief.  In the event that the Court determines that resolving that question requires a trial, ZTE is prepared to proceed quickly and the preliminary injunction should remain in place until the matter can be tried.

Dated:  February 5, 2015

      */s/ Mary B. Matterer*
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
(302) 888.6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Steven A. Moore (CA SBN 232114)
steven.moore@pillsburylaw.com
Callie Bjurstrom (CA SBN 137816)
callie.bjurstrom@pillsburylaw.com
Nicole S. Cunningham (CA SBN 234390)
nicole.cunningham@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
501 W. Broadway, Suite 1100
San Diego, CA  92101-3575
Telephone: (619) 234-5000
Facsimile:  (619) 236-1995

Barry K. Shelton (TX SBN 24055029)
barry.shelton@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
221 West 6th Street, Suite 1110
Austin, TX 78701-3443
Telephone: 512.375.4907
Facsimile: 512.479.6745

*ATTORNEYS FOR PLAINTIFF*
*ZTE CORPORATION*