UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| **ZTE CORPORATION**<br><br>                              **Plaintiff,**<br><br>vs.<br><br>**VRINGO, INC., and**<br>**VRINGO INFRASTRUCTURE, INC.,**<br><br>                              **Defendants** | C.A. No. 15-cv-00132-GMS |

## DEFENDANTS' MOTION TO DISSOLVE TRO AND PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, Defendants Vringo, Inc. and Vringo Infrastructure, Inc. (collectively, "Vringo") respectfully request that this Court dissolve the injunctive relief it granted to Plaintiff ZTE Corporation ("ZTE") on February 6, 2015 (the "Order").

## INTRODUCTION

ZTE filed this action after *over two years* of worldwide patent litigation between the parties. Due to ZTE's unwillingness to license Vringo's standard essential patents on FRAND terms, Vringo has been forced to litigate against ZTE in Australia, Brazil, France, Germany, India, Malaysia, Romania, Spain, the Netherlands, and the UK.[1] Vringo has been vindicated in a number of countries. Patent infringement trials have been held in the UK and Germany and ZTE has been found to infringe Vringo's standard essential patents. In Germany, the court characterized ZTE as an unwilling licensee when issuing an injunction against ZTE. Courts in Brazil and Romania have also issued injunctions against ZTE on standard essential patents.

---

[1] In February 2014, ZTE filed an antimonopoly complaint in China alleging Vringo violated its FRAND obligations. In April 2014, ZTE filed a complaint against Vringo with the European Commission in which FRAND issues have been fully briefed. Both cases are pending.

Issues related to FRAND, including Vringo's FRAND obligations, have been central in the litigations between the parties.

After having its multiple appeals considered and ultimately denied in Romania, on February 5, 2015, ZTE ran to this Court seeking a Temporary Restraining Order and a Preliminary Injunction[2] *to set aside the decisions of the Romanian appellate court*. In doing so, ZTE (1) reasserted the arguments in this Court that it has already litigated fully and lost in Romania,[3] and (2) sought relief based on the *incorrect* premise that Vringo was about to pay a bond to *effectuate* the Romanian injunction. In fact, the Romanian injunction was *in force from June 2014 until October 2014* and, after temporary suspension for an appeal to be heard, *has been in force for a month* – since January 8, 2015. Indeed, the Romanian appellate court has *ordered* Vringo to pay a bond of EUR 240,000 for the injunction *which is already in force*. ZTE has requested (and now received) from this Court an order prohibiting Vringo from complying with a Romanian appellate court order.

ZTE has relied on *Microsoft v. Motorola, Inc.*, 696 F.3d 872, 889 (9th Cir. 2012) in support of its arguments. However, based on the facts of this case, and as discussed below at pages 10-11, *Microsoft* does not support ZTE's case but, rather demonstrates why ZTE's complaint and requested relief is harmful to international comity.

ZTE failed to inform this Court of a pending litigation between the parties in the U.S. District Court for the Southern District of New York in which ZTE took a contrary position on a

---

[2] Despite ZTE's February 5, 2015 letter to the Court, stating that "ZTE is seeking a temporary restraining order to preserve the status quo *while the parties brief and the Court considers ZTE's motion for a preliminary injunction*" (D.I. 7 at 1), ZTE's proposed order (which was entered by this Court) included language to effectuate a preliminary injunction. (D.I. 3).

[3] In the Romanian appeal, the parties briefed issues related to FRAND, injunctions on standard essential patents, and ZTE's EUR 30,000,000 contractual penalty. After considering these issues under Romanian law, the Romanian Appeals Court reinstated the injunction against ZTE.

United States court's ability to issue an injunction impacting the jurisdiction of a foreign court. Moreover, ZTE engaged in questionable conduct when seeking relief from this Court, giving Vringo only a few hours' notice before seeking an *ex parte* hearing – after ZTE informed Vringo that this Court would be "flexible" to set a hearing and after ZTE was informed that Vringo was looking to engage counsel.

For the reasons set forth below, pursuant to Fed. R. Civ. P. 65, Vringo respectfully submits that this Court should dissolve the injunctive relief it granted.

## FACTUAL BACKGROUND

### The Romanian Injunction

For the past seven months, Vringo and ZTE have extensively litigated in Romanian courts the question of whether ZTE should be enjoined from selling products on the Romanian market. The Romanian trial court first enjoined ZTE from selling these products on June 30, 2014. Declaration of Dragos Vilau ("Vilau Decl.") ¶ 4. ZTE appealed that order on September 16, 2014, and Vringo and ZTE extensively briefed and argued the appeal, including ZTE's arguments that Vringo's request for a preliminary injunction against ZTE violates Vringo's FRAND obligations and ZTE would suffer tens of millions of Euros in contractual penalties with an injunction in place. *Id*., ¶¶ 5, 8. The Romanian appellate court temporarily suspended enforcement of the preliminary injunction on October 10, 2014 while it considered the appeal. *Id*., ¶ 6. Then, on January 8, the Romanian court ordered that the preliminary injunction was once again in force. *Id*., ¶ 9.

Although the Romanian injunction has now been fully in force again since January 8, 2015, the Romanian appellate court ordered Vringo to pay a bond of EUR 240,000, and stated

that if Vringo did not pay that bond, the injunction would be subject to termination. *Id*., ¶ 11, 13. Thereafter, ZTE filed more papers with the Romanian appellate court claiming enormous harm, in an attempt to attack the injunction by increasing the bond amount to a prohibitive EUR 40,003,916 amount. *Id*., ¶ 15. The Romanian court rejected this attempt. *Id*., ¶ 16.

**The Worldwide Litigations**

The parties are engaged in a complicated series of cases in numerous foreign jurisdictions. Those actions include patent infringement cases in Australia, Brazil, France, Germany, India, Malaysia, Romania, Spain, the Netherlands, and the UK. *See* Compl. ¶¶ 29-42. ZTE lost several of its battles against Vringo's patent infringement actions around the world, including in the UK litigation, where one of Vringo's patents has already been found valid and infringed by ZTE. Declaration of Ari Pekka Laakkonen ("Laakkonen Decl.") ¶ 9. In the German litigation, the court similarly held that ZTE had infringed another Vringo patent and that ZTE was an unwilling licensee, and therefore issued an injunction against ZTE. Declaration of Klaus Haft ("Haft Decl.") ¶ 6. ZTE asked a German appellate court to stay the enforcement of this injunction, and the appellate court rejected its request. *Id*., ¶7.

A court in the Netherlands has similarly issued a preliminary ruling that Vringo's seizure of ZTE products being shipped in violation of a German injunction was proper – notwithstanding ZTE's arguments that Vringo's actions were in violation of Vringo's FRAND commitments; ZTE has filed an appeal of that decision. Declaration of Bart J. van den Broek ("Broek Decl.") ¶¶ 4, 6-7, 14-15. In addition, Brazilian courts have considered FRAND issues, including whether ZTE was negotiating in good faith, before issuing and upholding injunctions against ZTE, and rejecting ZTE's numerous appeals. Declaration of Carlos Aboim. ("Aboim Decl.")

4

¶ 6. Finally, a court in France is due to begin trial on April 13, 2015 on FRAND issues, including whether Vringo's request for an injunction violates Vringo's FRAND obligations under precisely the same commitments to the European Telecommunications Standards Institute that are the subject of this litigation – an agreement that ZTE claims is governed by French law. Declaration of Sabine Age ("Age Decl.") ¶¶ 4, 6.

ZTE has now filed this new action in this Court with the express purpose of preventing (i) any enforcement of these duly entered and binding foreign injunctions anywhere in the world, and (ii) any further effort by Vringo to seek injunctive relief vis-à-vis its standard essential patents against ZTE anywhere in the world. Compl. at Prayer ¶ 5.

**The New York Litigation**

ZTE has not, however, disclosed in any of its papers that the identical entities are also parties to an action pending since July 2014 before the United States District Court for the Southern District of New York (the "SDNY Action"). *See* Compl. *Vringo Inc., et al. v. ZTE Corp.*, No. 14-cv-4988 (the "SDNY Action"), a copy of which is attached to the Declaration of Amber Wessels-Yen (the "Wessels-Yen Decl.") as Exhibit A. Likewise missing from ZTE's papers is that the SDNY Action also relates to the parties' disputes about the negotiation of patent license agreements and Vringo's FRAND obligations. Moreover, a central issue in the SDNY Action has been the effect to which a United States court has the power to issue an injunction that might potentially harm comity by impacting the sovereignty of a foreign court.

**ZTE's TRO Application**

According to ZTE's counsel, ZTE filed its TRO application at approximately 7 p.m. on February 5, 2015. Wessels-Yen Decl., ¶ 7. At 10:35 a.m. on Friday, February 6, knowing that Vringo was in meetings with ZTE that day, ZTE's counsel contacted Vringo's SDNY counsel

about this new case.  *Id.* ¶¶ 7, 9.  Indeed, on February 6, ZTE's Chief IP Officer, together with Oliver Hu (the ZTE employee who submitted a declaration in support of ZTE's TRO motion), was attending a meeting at Vringo's New York office to discuss potential resolution of the global litigations.  *Id.* ¶ 9.  ZTE was therefore fully aware that key Vringo decision makers would be occupied with these discussions on the day ZTE's counsel was reaching out to discuss the timing of this case.  Vringo's SDNY counsel informed ZTE's counsel that Vringo was seeking to engage counsel for the TRO application.  *Id.* ¶ 11.  Approximately three hours after the initial contact, Vringo's SDNY counsel emailed ZTE's counsel to confirm they would represent Vringo here and communicated availability for a hearing on the injunctive relief ZTE was seeking.  *Id.* ¶ 13.  Thirty minutes later, ZTE's counsel's next communication attached a copy of the entered Order. *Id.* ¶ 14.

## ARGUMENT AND AUTHORITIES

Numerous grounds exist for this Court to dissolve the extraordinary injunctive relief that was granted mere hours after Vringo's counsel was first notified of the filing of this action.

*First*, ZTE did not satisfy the requirements for an *ex parte* temporary restraining order. Because Vringo was not provided sufficient notice, Rule 65 does not permit the issuance of a temporary restraining order unless (i) ZTE presented specific facts clearly showing that they would suffer immediate and irreparable injury before Vringo was given an opportunity to be heard, and (ii) ZTE's counsel certified in writing that it exerted efforts to provide notice to the Vringo and the reasons why that notice should not be required.  Fed. R. Civ. P. 65(b)(1).  ZTE did not (and could not) satisfy either requirement.  The Romanian injunction has been in force between June 2014 and October 2014 and now for a month since January 8, 2015.  As such, there was no immediate or irreparable injury.  Further, ZTE did not serve its complaint or its

papers on Vringo at any point before seeking and receiving this injunctive relief. Instead, ZTE waited for fifteen hours after filing the TRO to even notify Vringo's outside counsel about the TRO, during a day when ZTE's counsel knew that Vringo was busy meeting with ZTE. ZTE's counsel then appears to have run directly to this Court to request an *ex parte* TRO hearing without certifying these efforts (or lack thereof) in writing – knowing that it had told Vringo's outside counsel that the Court would be "flexible" in hearing this matter and after knowing that Vringo was seeking to engage counsel. Wessels-Yen Decl. ¶¶ 8, 11.

Moreover, the Order, which appears to be identical to the draft order ZTE attached to its motion, does not address the requirements of Rule 65(b)(2) for a Temporary Restraining Order, as it omits the date and hour it was issued, fails to describe the injury and state why the injury is irreparable, fails to state why the order was issued without notice, and does not set a date on which the Order will expire.

*Second*, the relief granted in this Order should be dissolved because it is based on ZTE's mischaracterization of the status of the Romanian proceedings. As is set forth above and in Vilau Decl. ¶¶ 11-12, the Romanian preliminary injunction has been effective for seven months and, after appeal proceedings, in force for the last *month*, and Vringo was not required to post a bond for the preliminary injunction to become effective. However, the Romanian appellate court ordered Vringo to pay a bond to keep the preliminary injunction in place, and this Court's Order appears to prohibit complying with a Romanian court order that directed Vringo to pay a bond amount, failing which the Romanian injunction may be terminated. *Id.* ¶¶ 13, 21.

The *status quo ante* is therefore that ZTE is bound by an effective Romanian preliminary injunction, and ZTE seeks to alter that *status quo ante* by compelling Vringo's non-compliance with the Romanian court's order. The Romanian court has scheduled a hearing on this

Wednesday, February 11 to determine the deadline by which Vringo must pay its bond. *Id.* ¶¶ 20-21. In order to preserve its Romanian injunction, Vringo's Romanian counsel has advised that it must be ready to pay the bond by no later than February 11.

*Third*, the Order should be dissolved because ZTE has already raised the same arguments contained in its opening brief before Romanian and other courts deciding the ZTE and Vringo patent issues, and has lost, as described above. ZTE should be bound by *res judicata* by the many court decisions that have rejected its arguments. Instead, ZTE asks this Court to reach out to foreign patent infringement litigation and act as an appellate court, setting aside the rulings of foreign courts on the appropriate remedies available to Vringo under their countries' respective patent laws. Even if such actions by a United States court would not offend comity and would constitute a sound exercise of discretion, the fact that ZTE has repeatedly failed on its FRAND defenses in these foreign courts demonstrates that ZTE does not have a reasonable probability of success on the merits. Moreover, FRAND determinations with respect to Vringo's negotiations with ZTE are also central to cases already pending in the UK and China. *See* Laakkonen Decl. ¶¶ 11-15 and Wessels-Yen Decl. ¶ 3. There is thus no reason for this Court to consider allegedly emergent injunctive relief here because the FRAND issues that are the subject of this Complaint either have already been considered by other courts throughout the world or are being considered by foreign courts.

*Fourth*, the Order should be dissolved because it fails to establish appropriate security for Vringo. Rule 65(c) provides that no preliminary injunction or temporary restraining order may issue unless the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The Order is silent on any security to be provided.

*Fifth*, the Order should be dissolved as it fails to meet the requirements of Rule 65(d)(1). That Rule requires that every order granting an injunction and every restraining order (a) state the reasons why it issued; (b) state its terms specifically; and (c) describe in reasonable detail the act or acts restrained or required. The Order fails in at least the first two respects.

*Sixth*, the preliminary injunction should not have issued because Vringo was not afforded proper notice to prepare for and oppose the application for relief. *See Anderson v. Davila*, 125 F.3d 148, 156 (3d Cir. 1997) ("Federal Rule 65(a)(1) provides that a preliminary injunction may not be issued without proper notice to the adverse party. The Supreme Court has observed that the Rule requires, at the very least, 'a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition.'"); *CIENA Corp. v. Jarrard*, 203 F.3d 312, 319 (4d Cir. 2000) ("Although the Rule does not specify how much notice must be given to an adverse party before a court can enter a preliminary injunction, the Supreme Court has held that same-day notice is not enough."). In this instance, less than four hours of notice to outside counsel on a day during which ZTE's counsel knew that key Vringo representatives would be in meetings with ZTE (Wessels-Yen Decl., ¶ 9), is clearly insufficient.

*Seventh*, the Order should be dissolved because ZTE has not satisfied its burden to show how it would be irreparably harmed if the injunctions that are already prohibiting it from selling infringing products are enforced, or how the equities favor an order that allows ZTE to violate valid, worldwide injunctions – entered and affirmed after extensive patent infringement proceedings before foreign courts and reasoned judgments by those courts – without consequence. ZTE can face no valid, cognizable harm by being held accountable for any contempt of court orders that are already binding against it. ZTE's employee Oliver Hu has represented to this Court that, "My understanding is that ZTE will take all appropriate steps to

ensure compliance with such an [Romanian] injunction if and when it becomes effective." D.I. No. 6, ¶ 7.  Since the Romanian injunction is already effective, ZTE must comply with it, and any enforcement of that compliance would not create any hardship.

*Eighth*, the Order should be dissolved because it harms international comity and the sovereignty of foreign courts.  In the overlapping Vringo lawsuit against ZTE which has been pending for approximately seven months in the Southern District of New York, ZTE has argued to that court that preliminary injunctive relief requiring ZTE to withdraw an exhibit and a short description thereof from a complaint that ZTE had filed before a Chinese court would harm international comity and the sovereignty of Chinese courts.  Now, after ZTE has lost on the merits of patent infringement litigation and its FRAND defenses, it is seeking from a United States court in the last-filed of all the cases preliminary injunctive relief that (1) reverses rulings that Vringo has already obtained in another country by forcing Vringo to violate a court order, and (2) effectively prevents Vringo from enforcing any of the injunctions against ZTE that it has already obtained around the world (including by sending , even though ZTE is not being damaged in the United States and the relevant injunctions are all validly issued under the laws of the respective foreign countries.

ZTE also seeks via its Complaint here a preliminary and permanent injunction preventing Vringo from seeking any injunctive relief concerning its standard essential patents against ZTE anywhere in the world.  ZTE relies heavily on *Microsoft v. Motorola, Inc.*, but that decision, issued under "the unique circumstances of [that] case" only demonstrates why ZTE's requested injunction offends comity.  696 F.3d 872, 889 (9th Cir. 2012).  In *Microsoft,* the original litigation between two American parties was a US breach of contract dispute, and only eight months "into the above-described domestic litigation", Motorola brought a patent suit in

Germany. *Id.* at 878, 879. The district court noted that defendant's filing of the second action raised "concerns of forum shopping and duplicative and vexatious litigation" and frustrated the original court's "ability to adjudicate issues properly before it." *Id.* at 880. Here, the original suits are multiple foreign litigations pending for months or years against a foreign defendant and its respective foreign subsidiaries; ZTE's filing of this separate US litigation in purposeful avoidance of the SDNY Action raises "concerns of forum shopping and duplicative and vexatious litigation;" and this action would frustrate more than six foreign courts' ability to adjudicate issues properly before them for months or years.

Finally, even assuming *arguendo* that it were appropriate for the legal issues implicated by the relief ZTE seeks here to be considered in the United States, those issues should be heard in the SDNY Action where that court is already addressing the same issues presented here, namely, (a) a U.S. court's ability to issue injunctive relief affecting litigations elsewhere in the world, and (b) issues relating to compliance with FRAND obligations. A copy of a letter to Judge Lewis Kaplan, the judge presiding over the SDNY Action, seeking expedited briefing on the issue of consolidation, is attached to the Wessels-Yen Decl. as Exhibit B.

Simply put, there are no viable grounds justifying issuance of the extraordinary *ex parte* injunctive relief provided for in the Order. Vringo fully intends to defend itself against ZTE's allegations, and stands ready to appear at any hearing and to fully brief any application for injunctive or other provisional relief, provided Vringo receives appropriate notice.

## **CONCLUSION**

For the reasons provided above, Defendants respectfully request this Court immediately dissolve the injunctive relief it granted Plaintiff ZTE Corporation in its February 6, 2015 Order.

        Respectfully submitted,

        <u>Michael J. Farnan</u>
        Michael J. Farnan (Bar No. 5165)
        Farnan LLP
        919 N. Market Street, 12th Floor
        Wilmington, DE 19801
        Telephone: (302) 777-0300
        Facsimile: (302) 777-0301
        mfarnan@farnanlaw.com

        Of counsel:

        Karl Geercken (pro hac vice application forthcoming)
        Amber Wessels-Yen (pro hac vice application forthcoming)
        ALSTON & BIRD LLP
        90 Park Avenue
        New York, New York 10016
        Telephone: (212) 210-9400
        Facsimile: (212) 210-9444
        karl.geercken@alston.com
        amber.wessels-yen@alston.com

        *Attorneys for Plaintiffs Vringo, Inc. and Vringo Infrastructure, Inc.*

Date: February 9, 2015